Okay, our next case is Dixon v. Regional University System of the Oklahoma Board, number 24-7016. Counsel, you may proceed. Thank you, Your Honor. If it pleases the court, my name is Mark Hammons. I represent the appellant, Marcy Walking Stick Dixon. She appeals from summary judgment that was granted on her termination claim and retaliation claim. Those claims arose out of conduct by her supervisor, Dr. Reif, who made comments and conduct that were offensive to her based on her gender and based on her Native American origin, which is considered race. She also raised a claim under the FMLA. All of those were dismissed, and in doing so, the trial court erred in the formulation of the prima facie case on both the termination issue and the retaliation issue, erred in the consideration of the pretext evidence in the case. The court correctly, in our view, found that there is individual liability under the FMLA, although that is a first impression question for this circuit, but found that Dr. Reif was not covered by that using an economic realities test, which is simply not consistent with the rule of using statutory construction for the plain language of the statute. The court also granted qualified immunity on the basis that the individual liability issue had not been addressed by this circuit, but the circuit in Gray v. Baker had previously said that that question is not part of a qualified immunity analysis. All right. So we have the discrimination claim, the retaliation claim, and the FMLA retaliation claim before us now. That's correct. That is correct. All right. On the discrimination claim, was Ms. WalkingStick bringing a separate claim for separate claims for sex and race discrimination, or was it a combined claim? It was a combined claim. All right. And on that claim, I have a question for you on the prima facie case at summary judgment. To survive that, a reasonable jury could draw an inference of discrimination. On the prima facie case, well, she used the Kendrick four-part formulation, which was that she fell within the protected category. There was evidence by her own testimony that she was performing in a satisfactory fashion. She was nonetheless terminated for that, and the position remained open and, in fact, was ultimately filled by someone outside of that protected category, which are the four elements required by Kendrick and which have been used. They date back to McDonnell Douglas and the Teamsters case were first adopted, I think, in Perry v. Woodward in this circuit. It had been used pretty consistently throughout since that time. They'd never been overruled or modified. Well, Counselor, can I ask you about that? Because you devoted a substantial number of issues in your brief to say that the district court erred in the test that it applied for the prima facie case. But we just recently even said again in a case called McNellis v. Douglas County School District from a couple months ago that the elements of the prima facie case are a flexible approach. And even in that case, we reaffirmed the three elements that were used by the district court in this case. I think that case, that opinion probably came down after your briefs were filed. But would you agree with me that the President of this Court would set aside that argument that the wrong test was applied by the district court here? No, Your Honor. As I understand the President of the Court, it is that the prima facie case is flexible, but that the selection of the prima facie case generally belongs to the plaintiff in setting forth how they're going to prove that. And the plaintiff is entitled to select a prima facie case that is consistent with the precedent of this Court. This Court has never overruled Kendrick or said that it cannot be used. There are factual circumstances in which it may not be appropriate, but those generally involve issues not of termination, or issues like a rift where the position did not exist, or issues of promotion where the position simply was denied to an individual, so that Kendrick did not apply to that. The Kendrick case itself says that the Court has preferred that four-pronged structure in traditional cases of termination or failure to hire. Nonetheless, I think we could have selected a three-pronged test and used that. And as a matter of fact, part of our argument is that under the three-pronged test that this Court has set out, our evidence would have supported the prima facie case, notwithstanding that. Our concern is that under the doctrine of vertical stare decisis, it is important that district courts follow the precedent. If this Court has said that this prima facie case in Kendrick is satisfactory, then surely we're entitled to rely on that and present it. It doesn't mean we always have to, and it does mean in unusual circumstances that can be changed. But this change was not based on unusual factual circumstances. He just wouldn't apply Kendrick. So, counsel, can we jump forward in the McDonnell-Douglas framework and ask you about pretexts? Can you help me understand, what is it about, or what evidence do you have of pretext? I know the comments that were made at various times throughout her employment. How do you, or how did you tie those comments to the adverse employment action here that was based upon a protected trait that she had? Well, this Court and the Supreme Court in Reeves have clearly said that it is a pretext-only determination, that pretexts need not point to a particular motivating factor. It serves its purpose if it eliminates the credibility of the factors that were advanced. Now, they advanced two reasons, and we addressed both of those, as well as showing evidence of a general plan to come up with some reason, even claiming a reduction of force, which was just nonsense, was never even considered as a basis for that. The two reasons given were performance and falsification of records. On the performance issue, we showed that her performance evaluations were satisfactory. The Court weighed the evidence and said... Well, satisfactory, but weren't there issues that were identified in performance as well? I disagree with that, Your Honor. Taking the facts in the light most favorable to the plaintiff, there were comments showing where she could improve areas of her performance. That does not mean her performance was unsatisfactory. To say that to be satisfactory you have to be perfect is not consistent with either precedent or logic, for that matter. You can be perfectly satisfactory and still have room for improvement. That would be the appropriate interpretation when the rating on the areas where the comments were made was that she was satisfactory in every single case. More significantly, however, the university in its unemployment hearing presented sworn testimony saying we didn't fire her for performance. Now, if they're going to say that under oath... What did they say that they fired her for? For falsification of records, which the Unemployment Commission also rejected. But if they're going to say that on performance, why can't a jury find that that testimony is the most credible and realistic testimony and reject pretext? That's all we have to show. Can I interrupt? Yes, Your Honor. What if we were to say there's evidence of pretext as to the... performance issue, but not as to the timekeeping? Well, there is authority in this court that said... Now, what it says is that if the dominant reason is refuted, then secondary reasons need not be addressed. When there are two reasons and you refute one of them, I don't think the court has confronted that particular situation. It would seem to me that that would come very close to the dominant reason factor on it. But we also refuted the claim of falsification. The claim of falsification arose out of the matter for which she was reprimanded, and that was supposedly not correctly reporting her time in an area where she said she'd gotten permission to report it in that fashion. But in any event, the action that was taken was a reprimand, which they admit was a very low form of punishment. To fire her, they had to enhance that finding to a falsification. They did that by conducting a search for other instances in the past. What they found was an instance where she had reported her FMLA time differently than the HR recorded it. There was no showing that she reported it wrongly. That's not part of the evidence, and she was never told about that, which this court has said is evidence of pretext. Well, in addition to what you said by way of rebuttal to performance and timekeeping, what do you consider your strongest pretext evidence to be? Actually, I consider the stronger pretext evidence the notes that were created the day before they fired her going through clearly false and unsupported reasons as alternatives they could use for explaining that decision. How did she know that it was the day? I was uncertain about the timing of those notes. I didn't see a date on the notes, but does the record show when they were prepared? Well, the record shows that the creator of the notes, Ms. Lugg, the HR person, said she thought they were done the day before on August 15th. This was in her deposition? That's in her deposition. We cited that as part of the summary judgment. Did she also say she was the writer of the notes? And identified who else was present, which included Mr. Reif and Ms. Scott, who was one of the investigators on the case. Now, there are some novel issues in this involving FMLA. The court agreed, and it is the, in the majority of all the court decisions, individual liability appears to be the rule. There are three circuits who have agreed with that, the Third, Fifth, and Eighth Circuit. The Tenth Circuit has not addressed it. The court agreed with this. They have not argued that in opposition. I think that's clear from the statutory language where it talks about employers or persons acting on behalf of an employer. The issue is how you determine whether or not a person is liable for acting on behalf of the employer. They used an economic realities test, which this court has not adopted for individual liability. Under that, you've adopted it in other circumstances, such as where you've got two different employing entities to determine who's liable, and it fits with that. Is that what this issue turns on? In other words, if we decide that the economic reality test applies, do you end up losing on that issue? I would agree with that, Your Honor, but that would be contrary to the plain language and statute, which the Supreme Court has for the past two decades said that is the beginning and usually the ending point of construction. The only interpretable language is on behalf of an employer, and the Supreme Court actually has interpreted that language under the NLRB twice for 75 years. They've said that that language means that if you're performing a task assigned to you or something within the scope of your employment, then you're acting on behalf of an employer, and we would meet that test, although technically it should be remanded for the court's determination in the first instance. I've explained why the qualified immunity argument was false, and I'd like to reserve the remainder of my time, if I may. You may. Thank you, counsel. Good morning. May it please the court, I am Lexi Norwood, and I represent Northeastern State University and Dr. Richard Reed, the defendants in the district court case. We're here today because of the split in the circuit of the McDonnell-Douglas case. McDonnell-Douglas did apply the four-prong test, but it also left the door open saying that the later cases show that the three-prong test is actually preferred in the circuit, because it does make the plaintiff show that there is some inference of discrimination based on either race or sex. Why do you say there's a split? I mean, couldn't the cases be reconciled in the sense that McDonnell-Douglas, Kendrick, and others have recognized that the four parts, if established, are a prima facie case, but there may be other ways to show as well. But as long as you satisfy the four-part test, why isn't that enough? And if it isn't, wouldn't we be cutting against a lot of precedent, including McDonnell-Douglas itself? Yes, sir. The reason that the judge in the Eastern District used the three-prong test is because there still needs to be under Title VII some kind of inference of discrimination. But the four-part test, if you satisfy it, the cases say that's enough for a court to conclude, at least at that stage, that there is an inference of discrimination. Because, Your Honor, at that stage, the reason for Title VII is discrimination. And showing that somebody is no longer employed there, but the position is still open, does not create an inference. And is a member of a protected class. Yes, Your Honor. And was fired. Yes, Your Honor. Was qualified. And was qualified. All of those four together show basically that you can be a female Native American and be fired. And show that you basically have met a prima facie case for discrimination under Title VII. Isn't that what McDonnell-Douglas said? It does, Your Honor. Well, then, and that's not the end of the case by any means. No, Your Honor. And even if plaintiff were able to show a prima facie case in this instance, she still failed to show pretext when NSU offered their legitimate reason for firing the plaintiff. And so, going into pretext, I know we talked about... Counsel, before you talk about pretext, can you...  I guess maybe from the argument we just heard, I may be confusing what I thought I read in the brief, but what was the reason she was fired? I've heard poor performance and the issue with the leave accounting. But there may be some discrepancies on that. Can you clear that up for me, please? Yes, she was fired for poor performance and for improper timekeeping. For the improper timekeeping, she was given prior verbal warnings from Dr. Reeve, and she still continued to report time wrong, as shown on the May 4, 2018 complaint. For poor performance, the record shows that she was sometimes late for work. No punctuality. And those are all shown in her performance reviews dating back to 2015. She didn't get what she says is a... She got a satisfactory performance review, and she always did. Why isn't it exactly as plaintiff's counsel says? Anytime a supervisor is writing remarks on ways to improve beyond a satisfactory performance, they might indicate some things that she could improve on. Yes. That isn't evidence, is it, of performance issues, or she would have got a needs improvement rating? It can be evidence of performance issues. In this case, Dr. Reeve did put in her performance reviews the areas that she needed to improve on, and those are spelled out in our briefs. But as far back as 2015, she was not a perfect employee, and I know my opposing counsel has said you don't have to be a perfect employee, but the record is clear that she did have performance issues dating all the way back to 2015. But was never given anything below a satisfactory review. What else is there besides that? Besides that, there was an investigation by NSU after plaintiff filed her May 4th complaint, and that investigation did show other areas that the plaintiff was lacking in her performance at the university. So that didn't come up until she filed a complaint and there was an investigation. That's when the performance issues arise. That's not a strong argument in your favor, is it? Isn't that kind of contrary to, kind of indicate pretext? No, Your Honor. The investigation was to go in and find out if there was any discrimination by Dr. Reeve. The investigation showed that there was absolutely no discrimination by Dr. Reeve, but the employees had other concerns and their concerns were based on Ms. WalkingStick's conduct at work as well as her performance. Do you think it's fair to say that she would not have been fired but for the fact that she reported to Title IX and sort of started this process of reviewing her performance? No, Your Honor, I do not. There's evidence in the record that shows that even the president of the university was concerned because they weren't able to do fundraising because her division was not able to get out certain things on time. So being able to roll out and implement programs from IET on time is crucial to the university's being able to operate on a daily basis. So if we break this down, we've talked about Pranafasha Case and we're moving to pretext, but there's this in-between step that we often talk a lot about, which is the legitimate non-discriminatory reasons. That seems to be more what you've been discussing, is that step. That, well, there were timekeeping issues, there were performance issues, and those are legitimate reasons. But then we get to pretext, and the question is, well, okay, even if those were legitimate reasons, even if there's some evidence to back it up, were those the real reasons that this person was fired? And I want to ask you about a couple of aspects of the record on that regard. One thing that gave me pause was the meeting on July 23rd. I think Ms. Logue was there, Dr. Reif, and I think someone else, I can't remember who it was. But there was this discussion of whether they could come up with a way to get to fire Ms. Walkensticke through some loophole in the FMLA. Now, this happens before the investigation even starts, and they're already looking for reasons to get rid of her. Why isn't that pretty strong evidence of pretext, or at least enough to create a genuine issue of material fact for trial? Your Honor, the reason that that is not enough of a pretext is because the allegations made here are words from counsel. They are not shown in the record. The deposition of Ms. Logue does not say that they were looking for reasons to get rid of her. It does not say any of that. She simply said that these are her notes from that meeting, and those notes could mean anything. So there's nothing in the record to show that there was a meeting for them to meet and talk about ways to fire Ms. Walkensticke. Well, there are notes. I mean, it's not that there's nothing in the record. There are notes about the FMLA loophole. There's no testimony to say that anybody was looking for a reason to fire Ms. Walkensticke at all. Why would they even be talking about that, then? Your Honor, they were looking at her leave reports because she had misreported leave on a number of times. No, I understand. But the conversation, didn't it go further than that? I mean, don't the notes reflect that they were at least talking about or referencing that that could be a basis for termination? Your Honor, I don't think so. I think they're just notes that the Human Resources Department took during a meeting to talk about.  Well, let's talk about the other notes that were referenced earlier. Do you agree that Ms. Logue's notes were made the day before the termination? According to her testimony, yes, Your Honor. Okay. And didn't those notes reflect various reasons that she could be fired that weren't the reasons that she was fired? Your Honor, the person that took the notes is Human Resources. And so I'm sure that the Human Resources Department wants to be sure that they have evidence to support a termination before they terminate an employee. That would make sense. I don't think that the Human Resources Department... Were the notes limited to timekeeping and performance as a reason for termination? Yes, Your Honor, as far as I know. They were? I believe they were. I don't have them handy. I thought there was more to it than that. But we can look at the notes. Well, let me ask you about one other piece of evidence on pretext, which is the message that Dr. Reif sent in to the HR to talk about all of this. And he says, among other things, that he finds the accusation of sexism and racism insulting to my very core. At the conclusion of the investigation, I request that this committee give me my option to file a complaint of defamation of character. Now, that may not alone create a genuine issue of pretext, but isn't it relevant to pretext? Yes, Your Honor, it would be relevant to pretext, but this was sent not in retaliation for her complaint. This is sent because he's trying to get his side of the story and let the investigators know what actually happened. Well, it was sent after her complaint, and then the complaint's protected activity, isn't it? It is, Your Honor. And it was sent after the complaint was made. Yes, and he's saying that these things did not happen, that he never did any of the things that she has complained about of him. And if a complaint was made about me, I would be offended as well to my very core. And so that does make sense. But, Your Honor, the entire burden is on the plaintiff to show pretext and a prima facie case. The burden is not on the defendant to defend either one of those, and plaintiff clearly fell both of those in the district court. And I've only got about three minutes left, but if I could talk about FMLA for a few minutes. So the FMLA case, I know opposing counsel talked about the Gray case, and there is some distinguishment between that case and this case. And the first one is that the court found that you must assert a true defense of acting in good faith, and that is what happened here. Dr. Reif has always said that he has been acting in good faith. He didn't know the plaintiff had taken FMLA leave at the end, and in his answer, he proposes that he was acting in good faith at all times. And under the court in Gray, the McDonnell-Douglas test would also apply. As far as qualified immunity goes, the plaintiff bears the heavy burden to show that any conduct by Dr. Reif violated a constitutional or statutory right, and that those rights were clearly established, which they are not in the Tenth Circuit. The Tenth Circuit has not decided whether an individual can be held liable, but most importantly, whether a state employee supervisor can be held liable. And that's important because state employee supervisors need to be put on notice of what conduct is prohibited and what conduct is not. And if you look at the statute, the public employee version is under a different section. It doesn't say an individual. It says the agency. And then it wouldn't make any sense to give public entities sovereign immunity from FMLA, but then to allow liability for individual government employees. And so we would ask that this court affirm the district court ruling and the motion for summary judgment be affirmed. Questions? I want to clarify on these notes. I'm not sure I'm understanding your position. There's two different notes that were at issue. Are they both unsigned, or is there just one? I believe there's only one. That's the one that has plan restructure, false claim, theft of property, emails, etc. Can we show copy or delivery to home emails? Can we find evidence of gross misconduct on L drive and reduction in force, false claims, performance, gross, question mark, falsification of records, question mark. Is that the note that the HR director said she prepared the day before? It is, Your Honor. The day before her discharge or? Her termination. Her termination, yeah. You don't think that has any meaning at all? I do think it has some meaning, Your Honor, and Ms. Sloat was deposed in this case, but there's no evidence to show that they were looking for reasons to terminate her, other than. Can't we make some inferences from this note? Wouldn't it be appropriate to make inferences? Some inferences could be made, but they could also be made. Can we show copy or delivery to home emails, theft of property, false claim, falsification of records, lots of question marks? Yes, Your Honor, and the investigation did show a lot of things that the university was not on notice of when it pertains to Ms. WalkingStick's conduct and performance and timekeeping issues. And so they did look into those things to see if Ms. WalkingStick should be terminated. Theft of property, those emails? Your Honor, those have never been explained. That was the day before. Yes, Your Honor. And the other was a conversation or the other information that was, but the district court didn't consider this note, is that correct? Because it was undated and unsigned? Yes, Your Honor. And Dr. Reed did not participate in the decision to fire the plaintiff in this case. They did seek his input to see if he agreed that she should be terminated, and he did agree, but he did not make the ultimate decision to fire Ms. WalkingStick. That was by human resources and the vice president, Christy Lansall. In closing, I would just like to say that Ms. WalkingStick never tied any conduct by the people that decided to fire her, Ms. Lansall and Ms. Lowe, to anything that has to do with her race or sex. And under Title VII, her claim should fail. I thank you for your time, Your Honors. Thank you, Counsel. Thank you, Your Honor. The notes that you pointed out, Judge Ritz, were at a meeting with Dr. Reeve, Logue, and Ms. Clifton. Ms. Clifton was an investigator who had previously participated in the meeting where they did look for a reason to deny her FMLA protections. That's what the key man issue is. There's no other explanation for that. That's what they were discussing, saying that Reeve didn't know about her FMLA usage, which I thought they said is just nonsense. He participated in the meeting going over FMLA records. And Ms. Lansall, who was listed as the final decision maker, testified she relied on the recommendation of Mr. Reeve in doing that. And the Stott case by the U.S. Supreme Court indicates that at least can be evidence of causation. Certainly not something that could be ruled out on this record. I do have to point out they've said that during the investigation of her complaint, they gathered a lot of information against her. That does show up in the notes. I'm not sure how the questioning led to that. But what is clear is that they never presented any of that evidence to her or allowed her to respond, which this court has said is significant in determining pretext. She'd never been written up for anything except a reprimand on a time-coding error that she said she got approval on. And then she gets fired for circumstances that nobody talks to her about until Dr. Reeve says, man, I'd like to sue her. I'm so mad that she made this complaint against me, and makes that declaration to the investigators who gathered the information. Unless there are questions, we would ask the court to reverse and remand and address the first impression issues that will be necessary for determination of not only this case but many other cases. Thank you, counsel. Thanks to both of you for the arguments this morning. The case will be submitted, and counsel are excused. Thank you.